**Affirmed and Memorandum Opinion filed June 2, 2022.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-21-00702-CV

---

**C.M.M., Appellant**

**V.**

**DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, Appellee**

**and**

---

## NO. 14-21-00730-CV

---

**J.M.F., Appellant**

**V.**

**DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, Appellee**

---

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2018-04133J**

---

# MEMORANDUM OPINION

In these consolidated appeals, C.M.M. ("Mother") and J.M.F. ("Father") appeal the trial court's final orders terminating their parental rights to minor children A-A.M.F. ("Andrew"), A.M.F. ("Austin"), O.M.F. ("Owen"), A.M.F. ("Amber"), and P.J.F. ("Penny").[1] The trial court terminated appellants' parental rights on predicate grounds of endangerment and failure to comply with the service plan for reunification. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), and (O). The trial court further found that the termination of parental rights was in the children's best interest. *See id.* § 161.001(b)(2). Appellants challenge the legal and factual sufficiency of the evidence to support the trial court's predicate findings for termination and its best interest determination. Appellants also contend the trial court abused its discretion in appointing the Department of Family and Protective Services (the "Department") as the children's sole managing conservator.[2] We affirm.

## *Background*

The birth dates of the children who are the subjects of this suit are as follows: Andrew, September 26, 2009; Austin, December 6, 2011; Owen, January 27, 2016; Amber, February 25, 2017; and Penny, August 10, 2018. All five children were removed from their parents' custody in August 2018. The younger children, Owen, Amber, and Penny were placed with their current foster caregiver (hereinafter, "Caregiver") in March 2019, and Andrew and Austin were placed

---

[1] We use pseudonyms in this opinion to refer to appellants, the minor children, and the children's foster caregiver. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

[2] Mother and Father raise the same issues but number them differently. Mother lists five issues, separating out the challenge to each predicate finding as a separate issue. Father combines his challenges to the three predicate findings into his first issue and therefore only lists three total issues.

with her in May 2019. The parents' sixth child was born after the removal of the first five children from the parents' custody and is not a subject of the current suit. He was also subsequently taken into Department custody and placed with Caregiver.

In October 2018, the trial court adopted a family service plan for each of the parents and ordered them to comply with the requirements for reunification. Among other things, the requirements included that the parents: (1) submit to random drug testing and test negative; (2) complete a psycho-social evaluation and follow all recommendations; (3) participate in a drug and alcohol assessment and follow all recommendations; (4) maintain adequate, stable housing for more than six months and provide the lease agreement or mortgage to the Child Protective Services ("CPS") caseworker; (5) maintain stable employment for more than six months; (6) complete a parenting class; (7) refrain from criminal activity; (8) attend all court hearings in the case; and (9) maintain contact with the caseworker.

Trial in this case occurred on eight individual days spread from January 16, 2020 to August 12, 2021. The witnesses called included Mother and Father on multiple days each, the CPS caseworker, a child advocate appointed to the case, the children's Caregiver, a Department supervisor, and the children's guardian ad litem.

Mother was the only witness called on the first day of trial, January 16, 2020. She testified that she was 16 years old when she had Andrew, and although she and Father are not married, they have been together for twelve years. She explained that CPS became involved in their lives because she tested positive for marijuana at the birth of three of her children, Owen, Amber, and Penny. At the time of Amber's birth, both Mother and Amber tested positive for both marijuana and cocaine. Mother mentioned that she had been referred to the Department on

3

three occasions, and the Department suggested on each of the two prior occasions that she take parenting classes and submit to drug testing. She said that she started smoking marijuana occasionally when she was 22 and her oldest children were 6 and 4. She used marijuana with friends and occasionally Father. In regards to testing positive for cocaine at Amber's birth, Mother asserted she had not known she was pregnant until she gave birth and had only tried cocaine twice. She used cocaine with Father one time when they were not around the children. Mother stated she was unaware she had had several positive drug tests during her pregnancy with her youngest child, not a subject of this case, who was three months old at the start of trial. She then acknowledged that she had tested positive but contended it was because she used CBD for "[a]nxiety, stress relief, and to help sleep," and she denied engaging in any drug use during the pendency of this case. She later asserted her recent drug tests had been negative. She denied having a substance abuse problem but admitted she may have been addicted at one time and after substance abuse counseling, she no longer had that problem. She said that during counseling, she learned avoidance strategies such as staying away from people and places that could make her want to relapse, staying busy, and using "natural highs" from things such as exercise and meditation.

Mother stated her current substance abuse counselor is her third and she lost the prior two because she missed too many appointments. She acknowledged that she has yet to finish the requirements of her service plan even though she had been given extra time. Mother indicated she still needed to complete a parenting class and individual counseling but said she had completed her substance abuse therapy. She explained it was difficult to make appointments while holding two jobs, and there have been times she has had to choose between going to a class and not causing trouble at her job. She acknowledged, however, that she attended all her

4

visits with the children and that service providers were usually willing to work around her schedule.

When Penny was born, the family had been living in a hotel for three or four months. Mother explained that her job had "started going slow" and they got evicted from their apartment. At the time, Father had been staying at home with the children and was not working, while she had been working occasionally at a restaurant. As of the time of trial, she said that she was working as a waitress for two different restaurants and Father had just gotten a job at a restaurant but before had been working at a different restaurant. She acknowledged she had not given recent paycheck stubs to the caseworker. She said that she had worked at several different restaurants during the pendency of the case and described working a few months at each place. Also, at the time trial began, she said that she and Father had been living in an apartment for a month and a half but before that they were in a hotel. They had purchased several pieces of furniture to accommodate the children but needed more.

Mother acknowledged that she had been admonished she could have her parental rights terminated if she did not complete her services, and she admitted there was "really no excuse" but she was trying to work and get an apartment set up for the children's return. When asked why the children should have to wait even longer for her and Father "to get serious about working on [their] problems," Mother said that the children loved them and "don't deserve . . . to be with strangers and people they haven't grown up around just because we haven't finished a few classes."

Mother said that during their visits with the children, the children always asked when they can "come home." She says that she can tell the children love her and Father. The children want to cuddle on visits, and when the visits are over, it is

5

rough; Mother used to start to cry and then Andrew would start to cry, but she says that she tries not to let that happen anymore. She said that she can see that it is tearing the two oldest children apart, and she knows it's her fault. She also said, however, that the two oldest children were doing well in school. She acknowledged that Owen has been diagnosed with autism, and she said over the past year, he has become more verbal and calmer and was getting along better with people.

On February 10, 2020, Mother returned to the witness stand and testified in regard to future plans that the children needed to be in school and that she and father would coordinate their schedules so that one parent worked days and the other nights. She said that she and Father had just moved into a three-bedroom, two-bath apartment that would be sufficient for all the children. She explained that they did not get a place like that sooner because they needed to fix their credit by paying off a prior eviction and needed to save enough money for the deposit and first month's rent.

In regards to the requirements of her family service plan, Mother stated that she had been doing them "off and on" for about a year and a half but started doing them consistently about four months ago. She again explained that it was difficult to balance completing the requirements and working. She acknowledged having been discharged from individual therapy and substance abuse therapy three or four times each for noncompliance but said that she had completed individual therapy and the caseworker should have the completion certificate. She admitted not having a bank account of any kind or credit cards. She said that over the course of the case, they had bought several gifts for the children.

Mother admitted she has been arrested four or five times, mostly for theft in addition to one marijuana possession charge. She said that she learned to steal

6

when she was 14 from her mother. At the time of her testimony, Mother had criminal charges pending against her for conduct allegedly occurring during the pendency of the case, but she denied the charges had any merit. She said that she found out she was pregnant with her youngest child when she was in jail on another theft charge for about three weeks in July 2019, which was during the pendency of this case.

Mother admitted that she and Father had missed "quite a few" required drug tests. She explained that they had trouble receiving email notifications regarding the testing because they did not have Wi-Fi at their hotel. She said that she "tried to make an effort to check her phone more, but . . . obviously . . . didn't have a good enough plan." She said that she still had one more substance abuse counseling session to attend as well as her parenting classes.

Regarding Owen's autism, Mother said that she only became aware of the diagnosis once he was in foster care and that he did not do anything "out of the norm" when he was in her care. She also noted that the last couple of times she had seen him, he had grown calmer and was interacting more with the other kids and seemed happier. She admitted that neither Owen nor Amber ever saw a pediatrician while in her care, but she said the children went to the dentist regularly and were usually covered by Medicare, although it had lapsed a couple of times. She said that the children "hardly ever got sick" and she and father did not neglect their health. She further described the oldest two boys as happy to see the parents during visits but otherwise stressed out, sad, and not happy with the situation. She said that Andrew told her his grades were much better than they had been previously.

Mother asserted she had learned a lot about the importance of having stable work and not smoking marijuana and she wants her children to have a stable life.

And she again accepted responsibility for placing her children in the position of living in foster care. She stated she stopped smoking marijuana as soon as the children were taken out of the home, although she also asserted that other than making her feel a little lazy and leading to the CPS involvement in their lives, smoking marijuana did not really affect her. She said that she was done with that and did not intend to ever smoke marijuana again. In her drug class, she learned that smoking marijuana during pregnancy could have negative impacts on the unborn baby.

Mother also described an incident in February 2000 when a truck ran over Andrew and he sustained serious injuries. When Andrew subsequently started kindergarten, the teacher was not giving him the attention he needed, so the parents decided to homeschool him and then his brother Austin as well. Mother researched how to homeschool, and she and Father bought books and taught the two boys at home. She said Andrew seemed happier at home and seemed to be grasping the information better, but Mother acknowledged the boys were "way behind" in their education.

Regarding her parenting classes, Mother indicated CPS had yet to assign her a new counselor but Father had completed his parenting classes. She mentioned that she had been discharged for missing too many classes by the same provider that Father used. Mother again acknowledged she needed to complete her requirements in order to have her children returned and that she could have balanced her priorities better. She said that she wanted her children back more than anything in the world and did not want them to be negatively affected by CPS placement.

Mother explained that when the case began, they were living in an apartment but were fairly stable and she and Father were working. They were in the hotel

because they had been evicted from their apartment. They were also living in a hotel before moving into their current apartment.

Father also testified on February 10, 2020, explaining that the first time Mother tested positive for marijuana when a child was born, he talked to her about it but took no further action. He asserted he started smoking marijuana in 2016 or 2017 but subsequently admitted he had smoked marijuana before then. He said he did not stop smoking marijuana the first time CPS became involved with his family because he still needed to grow and learn. He insisted the last time he used marijuana was around the time this case began.

Regarding the requirements of the service plan, Father testified that he had completed his parenting classes and individual and group counseling and he had been working on his substance abuse classes for nine months. The reason he said it was taking so long was because on one occasion, he tested positive due to having used CBD, and on another occasion, his former counselor quit or was fired and the new counselor made him take additional classes because he tested positive for alcohol. Father acknowledged he had used cocaine once or twice in the three years prior to his testimony but denied using any other drugs. Father admitted missing most of the required drug tests in 2019 but blamed communication issues. He said they since "moved to a better hotel where [they] could have Wi-Fi." He also said that they requested the caseworker to text rather than email the testing requests. Father confirmed that they were evicted from two apartments, one where they lived for three years and one where they lived for about a year.

Father said he had recently taken a new job at a restaurant and before that, he had worked for six months each at two different restaurants. He reported giving the caseworker paystubs from those restaurants and said he gave her one whenever she requested verification of employment. The longest he has held a job since 2010

9

was two or three years when he worked for a staffing agency. He quit that job to spend more time with the children.

Regarding the children's health, Father confirmed that Owen and Amber had never been to see a pediatrician, but he said if any of the children got sick, he and Mother would take them to see a doctor. He agreed it was not ideal for the children to be in foster care and accepted he had the power to get them out.

On September 23, 2020, the trial court held a hearing on the parents' motion for a continuance. They requested the continuance in order to have more time to complete the required services. Mother testified briefly that their phone had been broken for about a month and they had been in quarantine because they had been sick three times. She said that they had not been able to leave their home to take drug tests or work and were receiving unemployment benefits. The trial court ordered the trial to resume on October 20.

The only witness to testify on October 20, 2020 was Father. He asserted that he had completed the requirements of his service plan except for one individual counseling session, which was missed due to the COVID-19 shutdown. Regarding the requirement he maintain stable housing for more than six months, he stated he had lived in a hotel for eight months and an apartment for six months. He acknowledged, however, that he had been evicted from his last residence about a month before his testimony due to nonpayment of rent and was currently in a hotel with "one or two" beds in it. He called it "an illegal eviction . . . due to the COVID." Nevertheless, Father insisted he had gained control of his finances. He also stated that he and Mother had been approved to move into a new apartment but had not done so yet.

Regarding the stable employment requirement, Father indicated he had worked for at least one restaurant during the case for six months, but he had been

unemployed since March and was investing his unemployment benefits in the stock market. He said that he had held two jobs a year for the preceding two years. Father also said Mother had just gotten a job working for Amazon.

He further insisted that he had maintained contact with the caseworker as required, but he acknowledged there were communication difficulties at times. He said that he and Mother had made most of their visits with the children but had begun to miss some the prior June because he and she got sick and their phone was broken. Father also stated he "was pretty compliant" with drug testing before the pandemic shutdown. He admitted that aside from gifts, he had not provided any financial support for his children during the pendency of the case. Father explained that the caseworker told him he could take the required classes virtually but if he did so, he would have to restart everything. He admitted he has done nothing to complete the class requirements since then. Father also asserted that he had to restart his classes because of the stay-at-home pandemic order. He believed this to be unjustifiable in the middle of trial and a national crisis. He said he asked the caseworker for accommodation but she refused and told him he had to be "reevaluated . . . and restart the whole thing." Father reiterated that he had not used drugs in a long time but again acknowledged that drugs had been found in his system.

Father said that during the most recent visit, the children were "very sad and frightened" and Andrew told Father he was not going to forget him and would find him in seven or eight years. Father reiterated he believed the children wanted to "come home" and he loved them and they loved him and he felt bonded with them. He said that if they were returned, they would not be in any physical or emotional danger. Regarding plans for the children, Father stated that they should stay in school and he wanted to get them into extracurricular activities. He said that he

would love for them to go to college but would support them in whatever they chose to pursue. He denied that the children had been left home alone at the time they were removed from the parents' home. He explained that he was home with the children while Mother was at the hospital with the newborn. He believed CPS took the children because they considered the family a flight risk during the investigation. He acknowledged that mistakes had happened in the past and the children deserved better than what they had.

With Owen, Father said that they figured the stress of moving to three different places in two years, i.e., "traumatic experiences," slowed his development. Father reads to Owen and talks with him on visits to help improve his speech. Regarding homeschooling the oldest children, Father explained that they decided to do that after the accident when Andrew began having problems in school. He described the subjects they taught the children and the methods they used. He acknowledged that when Andrew and Austin went back to school, they were behind in their education and had an adjustment period. He asserted that as Andrew entered his teenage years, he would need a father to help guide him. He planned to keep the children in counseling if they were returned home.

Father said that he had a good family support system with his father, mother, and siblings. His mother had wanted to take the children when they were removed from their home, but she got really sick. He said he did not ask his family for help before because he thought he had everything under control but he would do that differently now.

On December 9, 2020, Deidre Doxley testified that she had been the caseworker for the children since they were removed from the parents' home in August 2018. The children were originally placed in two different homes before being brought together with Caregiver. Owen was diagnosed with autism and was

12

receiving help through the school and a therapist that the Caregiver had found. In August 2018, the Department received several referrals for neglectful supervision of the children, which indicated the parents were being evicted. An investigation concluded that there was reason to believe the allegations and the children needed to be removed. She noted the family had had six prior referrals.

Doxley further testified that she drafted the parents' service plans and went over the plans with them, and the parents have not completed the requirements for return of the children. At the time of trial, the case had been pending for over two years, and Doxley opined the parents had had ample time to complete their services before the pandemic or even during the pandemic. According to Doxley, Mother still needed to satisfy the stable housing and employment requirements as well as a psychosocial evaluation, substance abuse assessment, and drug testing. She also had not completed individual or group counseling. Doxley asserted the last drug test results she had for either parent was from January. Although Mother had completed a substance abuse assessment, the Department deemed it invalid because Mother claimed she had not tested positive for drugs in the assessment when in fact she had tested positive within the relevant time period. Regarding employment, Doxley stated that she had not received paycheck stubs since 2019 and had no proof either parent had worked since that time. The last time Doxley had been able to verify any employment for the parents was in May 2020 when she learned from a restaurant general manager that Mother was employed but "never showed up."

As for Father, Doxley said that he still needs to establish stable housing and employment as well as take a substance abuse assessment and drug tests. She noted that Father has completed several substance abuse assessments. The most recent one was deemed invalid because he provided incorrect information regarding the

13

last time he used drugs, and the one before that needed to be redone after he was discharged for failing to attend recommended services. Doxley insisted that if the parents had asked for an accommodation because they had health concerns during the pandemic, the Department would have helped them. She noted that the providers offered services virtually and that such services were accessible in the same way that the virtual visits were accessible. She acknowledged that at one point, Father had completed his individual and group counseling and his parenting classes.

When asked whether anything had changed from the beginning of the case—when the parents were determined to be unstable and using drugs—Doxley stated that nothing had changed. She further said the Department had concerns regarding Mother's pending criminal charges. Doxley acknowledged that the parental visits were appropriate but mentioned the parents sometimes told the children they would be coming home. The visits had become virtual during the pandemic, and the parents attended all the virtual visits.

Doxley said that Andrew was doing "very well" in the foster home and is stable. He is "very bonded" with Caregiver, her family, and his siblings, and, in contrast to his demeanor before he was taken into custody, he is able to just "be a kid" and joke around and not try to parent the other children. She said Andrew is still behind in school but his grades have improved a lot. He receives speech therapy at school and his speech has improved. Regarding Austin, Doxley said that he was doing well, was bonded with the Caregiver, her family, and his siblings; his grades had improved significantly; and he was also receiving speech therapy in school. Doxley said that when they were removed from the parents, neither Andrew nor Austin knew how to spell simple words and it was difficult to understand them, but both had made significant strides in foster care. Doxley said

that Owen was also doing very well but had recently reverted back to screaming and crying. She said that the Caregiver and the school were working with him in light of his autism diagnosis. He likes school and appears to be bonded with the Caregiver and his siblings. The Caregiver has diligently followed up on all recommendations. According to Doxley, Amber is "[v]ery sassy, very bossy," can be aggressive with her siblings, the Caregiver, and even Doxley herself, and will hit people. The Caregiver redirects Amber and takes her to play therapy, but she is too young for psychiatric care. The youngest of the children in this suit, Penny, came into Department care at birth and is reportedly doing well and plays well by herself and with her siblings. The Caregiver had concerns regarding Penny's eyes and took her to an eye doctor, and she now wears glasses. Doxley opined that the length of the case was really affecting the children because they want stability and the parents were telling them one thing while she, Doxley, had to tell them another.

Doxley believes that termination is in the children's best interest because although the parents love the children, they have not shown an ability to provide the children with safety and stability or made any progress toward alleviating the reasons why the children were removed or completing their service plans, although they had been given "more than enough time." Regarding services, Doxley noted the parents blame the pandemic and contracting COVID for not completing the plans, but Doxley said the services were all available virtually, she tried to work with them, and the parents have never given her any proof that they contracted COVID. Other than providing the COVID excuse for missing a couple of drug tests, the parents did not otherwise offer an explanation for the many missed tests. According to Doxley, the parents have never indicated they had any technological difficulties, they managed to make their virtual visits, and the Department has accommodated any requests they have made.

15

On cross-examination, Doxley testified that prior to the pandemic, she had been told Father was working consistently but she never received proof of his employment as required by his service plan. She acknowledged that she made no accommodations for the parents regarding drug tests because they had gotten sick. Father tested positive for drug use but claimed it was because he was using CBD for back pain, but he never provided Doxley with a prescription. She also acknowledged that the children had stated a preference to be returned to their parents perhaps one time, months ago, but they have also said "other things." When the parents supplied misinformation during their substance abuse assessment, the Department determined that the misinformation invalidated the assessment, and Doxley provided them with a new referral for a different provider. She said that because the parents have not complied with drug testing, the Department does not know if they are using drugs. Doxley disagreed that it was difficult to remain employed during the pandemic. During virtual visits, the children will smile and laugh with the parents and not want to get off the call.

On January 6, 2021, Heather Croy with Child Advocates, Inc. testified that she was appointed as the child advocate on the case in October 2018, and she helped explain the service plans to the parents. She maintained that the parents had not fulfilled the requirements of their service plans although they have consistently made it to visits with the children. Child Advocates recommended termination of the parents' rights because they had not exhibited consistency throughout the case or an ability to care for the children. In two and a half years, the parents had made no progress on creating stability or eliminating their drug use. Croy indicated the parents had been given more than enough time to complete services, and she shared others' confusion regarding why they had not done so. And she emphasized the parents' frequent failure to appear for drug testing and failure to test negative

16

when they did submit to testing.

Child Advocates was also concerned regarding Mother's pending felony charges and outstanding warrant for her arrest. Croy explained that Child Advocates has had a difficult time communicating with the parents, particularly over the prior year, and she has not seen any proof of employment for the parents since 2019. The parents never asked for help in completing the required services, and Croy could not recall them ever requesting accommodations even though Child Advocates reached out to them regularly to try to get them back on track. Mother at one point blamed contracting COVID for why she had not completed required services, but Croy never saw any proof of that or heard any explanation as to why the services could not have been completed prior to the pandemic. Croy explained that some services had to be repeated because of the parents' recurring failure to submit to drug testing.

Croy described the children as doing "wonderful[ly]" in their foster home and said their behavior has improved, although Amber still struggles a bit and seeks attention. Croy speculated that Amber had been denied sufficient attention early in life because she had so many siblings. Croy said Owen, who has autism, had improved the most. The children have formed strong bonds with one another, and the Caregiver has ensured that they work with their therapists. The two oldest boys had improved "vastly" in school because the Caregiver gave them extra work to help them catch up. When removed from their parents, the boys were a year or two behind and had to begin from practically the beginning. They are intelligent boys who like to learn but are still a little behind.

Regarding the children's attachment to their parents, Croy posited that the two older boys appeared to have a strong bond with the parents and Owen appeared to have a "semi-bond" but the youngest two did not live with the parents

for long, so she could not be sure of their bond. Andrew and Austin go back and forth between saying that they want to return to their parents and saying that they would like to remain where they are and have visits with their parents. Croy thinks the length of the case is having an impact on the children as they ask her about what will happen to them. She has not seen any sign that the parents were becoming more stable in their moods or behaviors or in creating a safe and stable environment for the children. She acknowledged, however, that it was hard for a lot of people to find housing and employment during the pandemic.

Croy noted that the Caregiver is "absolutely" willing to adopt all the children and they are already a part of her extensive family. If the Caregiver does adopt the children, it would be up to the Caregiver to decide whether the parents could have any further contact with them. Croy acknowledged that the children's "loving, caring nature" was something that they got from their parents and all of them have a strong foundation of appropriate personality traits, but she also asserted the children have struggles resulting from the parenting they received early in their lives, including being left alone for extended periods of time and lack of education. During visits the parents showed excitement and were interactive with the children, but at one visit the parents inappropriately told the children they would be coming home.

Father returned to the witness stand on January 6 and asserted he had substantially complied with the service plan. Regarding housing during the pendency of the case, he explained that they had started in a hotel then moved to an apartment for six months but were now back in a hotel. He said he provided the caseworker with the lease agreement for the apartment but no other proof regarding housing. He believed the hotel satisfied the stable housing requirement as it was more expensive than an apartment.

18

Father reiterated his employment history and that he had contracted COVID three times but admitted he had not been tested. He asserted that COVID made it difficult to get things done but his pre-pandemic employment had been stable and he provided paystubs to the caseworker as proof. When he told the caseworker that they could not drug test due to COVID, she did not respond. He did not think to check with the testing companies as to whether there was a safe way to do the testing. He explained that being a waiter made him very susceptible to getting COVID.

Father complained that when CPS verified his employment it would cause problems and suggested that when Mother applied for jobs, the employer would somehow find out about her criminal record. He also described communications issues with the caseworker not responding to their inquiries.

On cross-examination, Father acknowledged that neither the apartment nor the Amazon job he had mentioned in his prior testimony had come to fruition. He acknowledged that Mother was facing two felony charges but asserted that if she went to prison, he would be able to make-do financially through his stock investments and with help from his family.

Mother also briefly testified on January 6, stating she was currently drawing unemployment. She was very concerned about COVID because her stepmother died from it as well as other people she knows. She said that Amber has also expressed a desire to return to her parents. She believed the criminal charges pending against her would soon be dropped. The parents planned to be in an apartment within a couple of weeks.

Trial concluded on August 12, 2021. At that time, Mother reported that she and Father had been living in a three-bedroom, two-bath townhome for over two months and had provided the lease to CPS. Both were employed at restaurants, but

19

they had not given the information to CPS, allegedly because of prior problems with her personal information being relayed to an employer. Mother explicitly accused the caseworker of sabotaging prior jobs. She insisted that she and Father had completed substance abuse assessments and all the services recommended by the provider but acknowledged they had not completed new parenting classes because she said CPS had not assigned them. Mother again blamed missing drug tests on fear of COVID and said that the caseworker offered no alternatives when they asked. Mother acknowledged there was currently a warrant out for her arrest.

Father concurred with Mother's testimony regarding the townhome, the reason they had not provided employment details, and the requests for alternative methods of drug testing. He further explained that they had enough beds for the children and plenty of furniture. He also insisted that he had completed all his classes and given the certificates of completion to the caseworker and that he had not used drugs since last smoking marijuana sometime in 2018.

The Caregiver testified that the children had been in her care for about three years. She said that when she first received the children, their speech was so bad that "you couldn't really understand what they were saying," so she put them in speech therapy, which helped a lot. Andrew had completed speech therapy, but several of the others were still in speech therapy. Andrew and Austin were also pretty far behind in school when they came into her care. Andrew was now on level, and Austin was mostly on level. She said all the children were bonded together and loved each other. Andrew and Austin are bonded to the parents, but the younger children are probably not. The older two boys also had previously expressed a desire to return to their parents but not recently. She believed that they would do well if the parents' rights were terminated.

If she was able to adopt the children, Caregiver stated she would consider

20

allowing the parents to continue to have access, but she had concerns because the parents sometimes told the children the opposite of what the Caregiver would tell the children. She requested that she be allowed to adopt the children if they were not returned to their parents; she said that the children were comfortable, settled, happy, and blossoming in her home. She described the children's activities such as playing sports and noted that she takes them to movies, bowling, the park, and roller skating, and recently took them to an Astros game.

The Department supervisor over the case, Tamitha Burnett, also testified. She denied that the parents had completed their required services or that the Department had received certificates of completion as the parents testified. The parents indeed had been discharged again from substance abuse counseling for failing to attend. She acknowledged, however, that she had not personally contacted any providers to determine where the parents were on completing their services. In rebuttal testimony, Mother denied that they had been discharged from services.

Lastly, the children's guardian ad litem, Youlanda Curvey, testified that Child Advocates, Inc. recommended termination of the parents' rights. She acknowledged that Andrew and Austin had expressed a desire to remain in their current placement, and Andrew had expressed a desire to keep in touch with his parents. She said the children were doing well and receiving the help that they needed.

As mentioned above, the trial court made three positive findings on grounds for termination of Mother and Father's parental rights, i.e., that Mother and Father (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being, (2) engaged in conduct or knowingly placed the children with persons who engaged in

21

conduct that endangered their physical or emotional well-being, and (3) failed to comply with the service plans for reunification. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), and (O). As required for termination, the trial court also determined that termination was in the children's best interest. *See id.* § 161.001(b)(2). The trial court then appointed the Department as the children's sole managing conservator. In their appeals, Mother and Father challenge each of the trial court's findings and the appointment of the Department as sole managing conservator.

### *Standards of Review*

As mentioned, Mother and Father challenge the legal and factual sufficiency of the evidence supporting the trial court's order terminating their parental rights pursuant to Texas Family Code section 161.001(b). Because of the severity and permanency of terminating the parental relationship, Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re J.F.C.*, 96 S.W.3d at 264.

In reviewing a legal sufficiency challenge under the clear and convincing evidentiary standard, we examine all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all contrary evidence that a reasonable factfinder could have disbelieved. *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

22

In reviewing termination findings for factual sufficiency, we consider and weigh all the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. We give due deference to the factfinder's findings and do not substitute our judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). As always, the trier of fact is the sole judge of witness credibility. *See In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re T.L.E.*, 579 S.W.3d 616, 626 (Tex. App.— Houston [14th Dist.] 2019, pet. denied).

### *Endangerment*

Appellants challenge the legal and factual sufficiency of the evidence to support the trial court's endangerment findings under Family Code subsections 161.001(b)(1)(D) and (E). Under these provisions, courts are authorized to terminate parental rights respectively if the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child" or "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(D), (E). "Endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam). Endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," but it is not necessary that conduct was specifically directed at the child or that the child actually suffered injury. *See id*.

23

Subsections D and E differ principally with respect to the source of the danger to the child. Endangerment under subsection D focuses on evidence of the child's environment, including living conditions and the parent's conduct in the home. *See In re L.E.R.*, No. 14-21-00590-CV, 2022 WL 1088592, at *8–9 (Tex. App.—Houston [14th Dist.] Apr. 12, 2022, no pet. h.). A child is considered endangered when the environment creates a potential for danger and the parent is aware of the danger yet consciously disregards it. *Id.* Inappropriate, abusive, or unlawful conduct by a parent or other persons who live in the home can create an environment that endangers the physical or emotional well-being of a child. *Id.* A single act or omission may be sufficient to support termination under subsection D. *Id.* at *9. In evaluating endangerment under subsection D, the court must consider the child's environment before the Department obtained custody. *Id.*

Under subsection E, the relevant inquiry is whether the endangerment of the child's physical and emotional well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Unlike subsection (D), termination under subsection E must be based on more than a single act or omission because the statute requires the parent engage in a voluntary, deliberate, and conscious course of conduct. *Id.* "As a general rule, subjecting children to a life of uncertainty and instability endangers the children's physical and emotional well-being." *In re J.O.A.*, 283 S.W.3d at 345. Under subsection E, courts may consider conduct occurring both before and after the Department removed the child from the home. *In re S.R.*, 452 S.W.3d at 360. Relevant conduct may even occur before the child's birth, while the parent had custody of older children. *See In re J.O.A.*, 283 S.W.3d at 345.

**Endangerment by environment.** We begin our consideration of the

24

evidence pertaining to the environment the children experienced while in the parents' care by noting the significant evidence that at the time of removal, at least the older children were significantly behind in their education and could not be understood when they attempted to talk. Multiple witnesses and documents stated these concerns, and Croy, the child advocate, asserted Andrew and Austin had to basically start their education from the beginning once they came into custody. Additionally, except for the youngest child who was not assessed, all the children were diagnosed with mental health concerns, including "adjustment disorder," "victim of neglect," and reading, communication, and language disorders. With this evidence of the children's condition at the time of removal in mind, we turn to the environmental evidence.

To begin with, both parents admitted to using illegal drugs while they had custody of the children and considerable evidence supports those admissions. *See generally In re L.C.L.*, 599 S.W.3d 79, 86 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (holding that a parent's drug use alone, without proof of any connection to endangering their children's welfare, is insufficient to justify terminating a parent-child relationship). Mother tested positive for marijuana at the birth of two of the children and positive for marijuana and cocaine at the birth of a third child. Also, two of the children tested positive for marijuana at birth, and Penny tested positive for both marijuana and cocaine. Although Mother asserts that she did not know she was pregnant until she went into labor with Penny, she did not deny knowing she was pregnant when she used marijuana while pregnant with the other two children. Mother acknowledged that drug use during pregnancy could have serious consequences for the unborn child. Father indicated he talked to Mother about her drug use after one child was born with drugs in his system, but Father acknowledged not doing anything to correct the situation. The child

advocate's reports to the court also noted that Mother and Father appeared to be abusing drugs at the time of removal. The trial court could have surmised from this evidence that drug use was a persistent environmental factor in the home.[3]

Next, there was substantial evidence regarding the parent's lack of stable housing while the children were still in their care. By the time of removal—which occurred in August 2018, well before the pandemic—the family had been evicted at least twice from apartments and were living in and out of hotels. One of the child advocate reports stated the family was at one point homeless, although it did not provide any details regarding this statement. Father himself, however, recognized that the lack of stability in housing had negatively impacted the children. *See In re J.O.A.*, 283 S.W.3d at 345 ("[S]ubjecting children to a life of uncertainty and instability endangers the children's physical and emotional well-being."); *In re B.N.D.*, No. 04-21-00286-CV, 2021 WL 6127883, at *4 (Tex. App.—San Antonio Dec. 29, 2021, no pet.) ("Mother's lack of stable housing and a consistent home environment exposed the children to a life of uncertainty and instability that endangers the children's physical and emotional well-being."). The child advocate reports also detailed conditions within the parents' home, including that they had no furniture or food and that the children were living in "deplorable conditions," went unsupervised sometimes for days, were apparently not fed properly, and had access to moldy food.

Mother's criminal conduct and charges also added to the family's instability.

---

[3] Parents point out that Family Code section 262.116 was amended recently to provide that the Department may not remove a child based on evidence a parent tested positive for marijuana unless the department has evidence that such use caused significant impairment to the child's physical or mental health or emotional development. Tex. Fam. Code 262.116(a)(7). As parents recognize, the amendment does not apply to cases such as this filed prior to the effective date of the amendment, September 1, 2021. Act of Apr. 28, 2021, 87th Leg., R.S., ch. 8, §§ 15, 16. Moreover, removal of the children in this case was based on far more than a positive test for marijuana.

*See, e.g.*, *In re R.R.*, No. 14-19-00603-CV, 2020 WL 262725, at *7 (Tex. App.—Houston [14th Dist.] Jan. 16, 2020, pet. denied) ("[A parent's] criminal conduct that exposes them to the possibility of incarceration can negatively impact a child's living environment and emotional well-being."). Mother received deferred adjudication on a theft charge in January 2013 and a 30-day jail sentence for possession of marijuana in June 2015. Mother was also on probation for robbery when Andrew was born.

It further would have been reasonable for the trial court to conclude that the lack of education and medical care the children received while with their parents contributed to an environment that endangered the children's physical and emotional well-being. The parents admitted the younger children had never been to see a pediatrician, and there was evidence the parents failed to take Andrew for follow-up care after he was run over by a truck. *See, e.g.*, *In re A.M.*, No. 07-18-00141-CV, 2018 WL 3799885, at *10 (Tex. App.—Amarillo Aug. 9, 2018, pet. denied) (mem. op.) (considering failure to seek appropriate medical care as evidence of an endangering environment). Although the parents' decision to homeschool Andrew and Austin is, of course, not grounds for termination, *see generally* Family Code section 262.116(a)(1), the parents' apparent subsequent failure to provide the children with an education could certainly be seen as endangering the children. *See, e.g.*, *In re N.P.*, No. 09-20-00218-CV, 2021 WL 203339, at *6 (Tex. App.—Beaumont Jan. 21, 2021, pet. denied) (mem. op.) (considering failure to address child's needs regarding speech impediment, developmental delay, and educational issues under subsection D). The child advocate reports noted that no books or computers for homeschooling were observed in the home. Although the parents testified that they purchased suitable homeschooling materials, the trial court could have disbelieved that testimony. As

27

mentioned above, the older children were significantly behind in their education when taken into custody, had speech and reading issues, and basically had to start their education from the beginning.

Taken together, the evidence was legally and factually sufficient to support termination under subsection D for knowingly placing or allowing the children to remain in conditions or surroundings that endangered their physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(D).

**Endangerment by conduct.** Much of the evidence discussed as relevant to subsection D—i.e., regarding parents' drug use, lack of stable housing, criminal record, and educational and medical decisions—is also relevant to our analysis of whether the parents engaged in conduct that endangered the physical or emotional well-being of the children under subsection E. *See, e.g.*, *In re J.O.A.*, 283 S.W.3d at 345 (explaining that a parent's drug use and its effect on his or her parenting may qualify as an endangering course of conduct); *In re E.W.*, No. 14-19-00666-CV, 2020 WL 742327, at *8 (Tex. App.—Houston [14th Dist.] Feb. 13, 2020, pet. denied) (mem. op.) (noting failure to provide appropriate medical care for a child may constitute endangering conduct under subsection E); *In re A.A.C.*, No. 14-19-00560-CV, 2019 WL 6913327, at *6 (Tex. App.—Houston [14th Dist.] Dec. 19, 2019, no pet.) (mem. op.) (explaining that evidence of criminal conduct, convictions, imprisonment, and their effects on a parent's life and ability to parent, and routinely subjecting children to the probability that they will be left without their parent endangers children's physical and emotional well-being); *In re J.C.R.*, No. 04-18-00949-CV, 2019 WL 2110109, at *4 (Tex. App.—San Antonio May 15, 2019, pet. denied) (mem. op.) (considering failure to educate child under subsection E); *In re T.G.R.-M.*, 404 S.W.3d 7, 16 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (considering lack of stable housing under subsection E).

As mentioned above, under subsection E, the trial court was additionally able to consider conduct occurring after the Department removed the children from the home. *See In re S.R.*, 452 S.W.3d at 360. Here, there was evidence that the parents' housing instability and drug use and the Mother's criminal conduct continued after the children were removed. The parents were evicted again and continued to live in and out of hotels. They also failed drug tests and refused to submit for drug testing on numerous dates. *See, e.g.*, *In re E.R.W.*, 528 S.W.3d 251, 264 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (holding factfinder could reasonably infer from a parent's refusal to take a drug test that the parent was using drugs); *see also In re K.A.C.*, 594 S.W.3d 364, 373 (Tex. App.—El Paso 2019, no pet.) (explaining that mother's drug abuse during pregnancy may constitute conduct that endangers the well-being of a child and mother's continued drug abuse when she knew her parental rights were in jeopardy "is conduct showing a voluntary, deliberate, and conscious course of conduct, which by its nature, endangers a child's well-being"). The parents explained that their housing instability related to the widespread difficulties experienced during the global pandemic. Parents also blamed many of the missed drug tests on their concerns regarding the pandemic, but the evidence conflicted as to whether they requested alternative procedures or other accommodations due to the pandemic. The credibility and weight of that evidence was an issue for the factfinder to determine. *See In re A.B.*, 437 S.W.3d at 503; *In re T.L.E.*, 579 S.W.3d at 626. The record also demonstrates that Mother faced additional criminal charges for conduct allegedly occurring during the pendency of the case.

The evidence discussed above was legally and factually sufficient to support termination under subsection E based on the parents' allegedly engaging in conduct which endangered the physical or emotional well-being of the children.

*See* Tex. Fam. Code § 161.001(b)(1)(E). Accordingly, we overrule the parents' issues challenging the sufficiency of the evidence to support the trial court's predicate findings for termination under section 161.001(b)(1).[4]

### *Best Interest*

We now turn to the parents' challenges to the legal and factual sufficiency of the evidence to support the trial court's finding that termination was in the children's best interest. There is a strong presumption that the best interest of a child is served by keeping the child with a parent. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). The party requesting termination bears the heavy burden of rebutting that presumption. *See In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). No specific set of facts is required to establish that termination is in the best interest of a child, but there are several nonexclusive factors that may guide the factfinder's best-interest determination. *See In re L.M.*, 572 S.W.3d 823, 837 (Tex. App.—Houston [14th Dist.] 2019, no pet.). These factors include: (1) the desires of the child; (2) the child's emotional and physical needs now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) any acts or omissions of the parent that may indicate the existing

---

[4] Having determined the evidence was sufficient to support the predicate findings for termination under subsections D and E, we need not consider the parties' arguments pertaining to subsection O. *See In re M.P.*, 639 S.W.3d 700, 702 (Tex. 2022) ("Only one predicate ground and a best interest finding are necessary for termination[; h]owever, due process requires that courts also review termination under Subsections 161.001(b)(1)(D) and (E) even after affirming termination on another ground because of the collateral effects of termination on those grounds.").

parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re E.R.W.*, 528 S.W.3d at 266; *see also* Tex. Fam. Code § 263.307(b) (listing factors to consider in evaluating a parent's willingness and ability to provide the child with a safe environment). The same evidence used to establish grounds for termination under section 161.001(1) may be probative in determining the best interest of the children. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

**The children's desires.** It was undisputed at trial that the parents love the children and the children love the parents. *See generally In re F.M.E.A.F.*, 572 S.W.3d 716, 732 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) (explaining that a child's love for a parent is an important but not controlling best interest factor). It was also established that at least the oldest two children, Andrew and Austin, had stated a preference at some point to return to their parents. There was testimony, however, that the boys had not stated such a preference recently and had said "other things," including that they wanted to stay with Caregiver and have visitation with their parents. Mother testified that Amber had also stated a desire to return to the parents' care, but there was no evidence regarding the preferences of Owen or Penny. Several witnesses explained that if the children were not able to return to their parents, they wanted to remain with Caregiver.

**Emotional and physical needs and danger.** A parent's ability to provide a child with a safe environment is a primary consideration in determining the child's best interest. *L.B. v. Tex. Dep't of Fam. & Protective Servs.*, No. 14-21-00552-CV, 2022 WL 906020, at *3 (Tex. App.—Houston [14th Dist.] Mar. 29, 2022, no pet.) (mem. op.). As discussed above, there was evidence that at the time of removal from the parents' home, at least some of the children suffered from educational and

31

speech deficiencies that were being addressed while with Caregiver. There was also evidence the children were not being fed properly when with their parents and were left unsupervised. Doxley testified the children needed stability and explained that although the parents love the children, they had not shown an ability to provide the children with safety and stability. There was clear evidence of emotional and physical risk to the children should they be returned to their parents' care, from the lack of stability and supervision to the allegedly ongoing drug use and criminal conduct. Numerous witnesses also discussed the toll the delay in finding permanency was taking on the children. It must be recognized, however, that witnesses also explained that being away from their parents was causing the children stress.

**Parenting abilities.** As discussed in detail above, the parenting abilities of the parents is one of the more troubling aspects of this case. *See In re C.H.*, 89 S.W.3d 17, 27–8 (Tex. 2002) (explaining that historical deficiencies in parenting are relevant to the inquiry). While love clearly existed in the parents' home and was exhibited during post-removal visitations, the children apparently received little education and developed speech problems in their parents' care. There was also evidence that the children did not have a stable residence, were left unsupervised, and were not provided adequate food. Although the parents denied using drugs around the children, they clearly were using drugs while they had legal custody of the children, and Mother had persistent legal troubles. Additionally, the record shows little indication the parents' abilities have sharpened since the children were removed. Despite receiving extra time to complete their family service plans, the parents were repeatedly dropped by service providers for failing to appear and participate. They further failed and refused to take scheduled drug tests. Father, however, testified that he had completed most of his required

32

services, and both parents asserted that they had grown and learned since the children were removed.

**Programs available to assist.** There is not much evidence in the record regarding programs that are available to assist those seeking custody of the children. The history of the parents suggests that even when services were available, they did not make much use of them, deciding instead to keep the children out of school and not take them to see a doctor regularly. Caregiver, on the other hand, has developed a history of using available services, having the older children in speech therapy through the school, making sure Owen received appropriate autism therapies, and having all the children see therapists. The parents did state that they intended to keep the children in school if returned to them.

**Plans for the children.** Father spoke admirably of wanting his children to be in school and possibly go to college, if that is right for them, and of helping them to become whatever they want to become. Both parents discussed having the children continue in extracurricular activities, and they asserted that they recently moved into a townhome and were preparing it for the children's return. The Department's goal for the children is adoption by the Caregiver and, indeed, the Caregiver stated a desire to adopt all the children and keep them together if they are not returned to their parents. There was evidence from several sources that the children were bonded with Caregiver and her family and were generally happy in her home. She appeared devoted to meeting their needs and ensuring they got caught up in school and continued to see their therapists. She has them engaged in extracurricular activities and takes them on frequent outings.

**Stability.** The stability of the proposed home environment is an important consideration in determining whether termination of parental rights is in the children's best interest. *In re A.G.*, No. 14-18-01089-CV, 2019 WL 2385723, at \*5

33

(Tex. App.—Houston [14th Dist.] June 6, 2019, pet. denied). The constant instability of the parents' existence is discussed in detail above; the frequent evictions, moves, and job changes, the drug use and criminal activity have all contributed to a high level of instability in their home. Again, it must be recognized that the parents explained that much of their recent trouble in finding stable employment and housing related to widespread difficulties incurred during the global pandemic. In contrast, Caregiver's home appears to be a highly stable environment where the needs of the children are consistently met.

**Acts and omissions of the parents and any excuses.** Relevant acts and omissions of the parents have largely already been discussed: the failure to provide a stable home life, education, medical care, and adequate food and supervision and the persistent drug use and criminal conduct. The parents' inability to complete the requirements of the service plans for return of the children is also worth noting. Although the parents testified that they have learned and grown through the process and have stopped using drugs, the trial court was free to discount this testimony in light of their past behavior and failure to complete services and take numerous required drug tests. The parents asserted that completing services and complying with drug testing was difficult due to their need to work and the pandemic, but there was testimony that the parents were given additional time to complete the requirements and the Department would have provided accommodations to address their concerns had they made them known.

**Conclusion.** On this record, a reasonable factfinder could have formed a firm belief or conviction that termination was in the children's best interest. *See In re J.O.A.*, 283 S.W.3d at 344. Although it is clear from the record that the parents love the children, it would also have been reasonable for the trial court to conclude that the parents lacked the ability to provide a safe and stable environment and

successfully parent the children. This is supported by the conditions that the children endured while with the parents and the parents' inability to complete services, stay off drugs, and stay out of criminal trouble. Additionally, the evidence strongly indicates that the children are happy and blossoming in Caregiver's care, and adoption by Caregiver appears to be a logical next step for the children. We overrule the parents' issues challenging the sufficiency of the evidence to support the trial court's best interest finding under Family Code section 161.001(b)(2).

### *Appointment of Department as Conservator*

Lastly, Mother and Father contend that the trial court abused its discretion when it appointed the Department as the children's sole managing conservator. As Father recognizes, we have previously held that when evidence is sufficient to support parental termination, a trial court does not abuse its discretion in appointing the Department as the child's sole managing conservator. *See In re T.N.R.*, No. 14-21-00473-CV, 2022 WL 370035, at *7 (Tex. App.—Houston [14th Dist.] Feb. 8, 2022, no pet.) (mem. op.); *In re M.P.*, 618 S.W.3d 88, 109–110 (Tex. App.—Houston [14th Dist.] 2020), *rev'd on other grounds*, 639 S.W.3d 700, 702 (Tex. 2022). Because the trial court terminated the parents' rights to the children and we affirm that decision, we cannot say that the trial court abused its discretion in appointing the Department as the children's sole managing conservator. Accordingly, we overrule Mother's and Father's final issues.

### *Conclusion*

We affirm the trial court's final orders terminating the parental rights of Mother and Father to A-A.M.F., A.M.F., O.M.F., A.M.F., and P.J.F and appointing the Department as sole managing conservator.

/s/     Frances Bourliot
        Justice


Panel consists of Chief Justice Christopher and Justices Bourliot and Spain.